| | | |
|---|---|---|
| IVAN G. MCKINNEY, | : | |
| Plaintiff, | : | Civ. No. 14-3564 (KM) (JBC) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| DR. HEMSLEY, *et al.*, | : | |
| Defendants. | : | |

**KEVIN MCNULTY, U.S.D.J.**

## I.    INTRODUCTION

The plaintiff, Ivan G. McKinney, is proceeding *pro se* in this civil rights matter filed

pursuant to 42 U.S.C. § 1983. The only claim remaining in this matter is one of deliberate

indifference to medical needs, asserted against three defendants: Dr. Michael Hemsley, Captain

Edward T. Pawson, and Warden Robert J. Bigott. Now before the court are two motions for

summary judgment, one brought by Dr. Hemsley (DE 97), and the other brought by Capt.

Pawson and Warden Bigott (DE 96). For the reasons stated herein, the motions will be granted.

## II.   BACKGROUND

Mr. McKinney is currently incarcerated at New Jersey State Prison ("NJSP"), where he is

serving a life sentence. *See State v. McKinney*, No. A-1946-13T1, 2017 WL 370918, at *1 (N.J.

Super. Ct. App. Div. Jan. 25, 2017). McKinney's present civil action, however, concerns the

purportedly deficient medical care he received at a different prison, Bergen County Jail ("BCJ"),

during two prior, relatively brief periods of incarceration. McKinney's first stint at BCJ began on

February 23, 2011, and lasted "sixty days or so" (*see* McKinney's Feb. 27, 2018 Dep. Tr., DE

96-4 at 39-41); McKinney's second stint at BCJ began on or about February 22, 2012 and

concluded on August 1, 2013. (*See* DE 96-4 at 30-31.) Dr. Hemsley, Warden Bigott and Capt. Pawson all worked at BCJ throughout Mr. McKinney's time(s) there.

### a. Factual Background

Documents and other record evidence establish certain underlying facts beyond reasonable dispute.

On July 6, 2010, McKinney – who was then incarcerated at yet a third institution, Southwoods State Prison ("SWSP") – was examined by Dr. Rajiv Shah at NJSP's Surgery Clinic. (*See* Dr. Shah's July 6, 2010 Consultation Report, DE 99 at PageID 841.) At that time, Dr. Shah diagnosed McKinney as having an incarcerated,[1] non-reducible, umbilical ventral hernia. (*Id.*) As explained by Dr. Shah, McKinney was then "a 37-year-old male who [was there] for evaluation of the umbilicus which appeared when he was lifting and going on the top bunk of his bed. He felt a pop and he has been having pain since then." (*Id.*) Dr. Shah's July 2010 report notes that McKinney had no past medical or surgical history, no nausea, vomiting, or fever, and that "on examination [McKinney's] abdomen [was] soft, nontender, [and] nondistended." (*Id.*) Dr. Shah concluded that surgery to treat McKinney's hernia would be appropriate, and should be scheduled in two to three weeks. (*Id.*) Other than a passing reference to McKinney's complaints of "some pain over the bilateral upper and lower extremities," the only medical condition discussed in Dr. Shah's one-page report is the hernia. (*Id.*)

---

[1]     To avoid misunderstanding, I note that the term "incarcerated" has a medical meaning when applied to an inguinal hernia:

> Incarcerated hernia. If the contents of the hernia become trapped in the weak point in the abdominal wall, it can obstruct the bowel, leading to severe pain, nausea, vomiting, and the inability to have a bowel movement or pass gas. Strangulation. An incarcerated hernia can cut off blood flow to part of your intestine.

www.mayoclinic.org/diseases-conditions/inguinal-hernia/symptoms-causes/syc-20351547

On July 22, 2010, McKinney advised SWSP that he would forgo his planned surgery with Dr. Shah – and would instead have the surgery performed by his "doctor on the street" – because he was "going home in 16 days." (*See* McKinney's July 2, 2010 Medical Consent Form, DE 99 at PageID: 773.) At his deposition, McKinney testified that he was released from SWSP on parole on August 8, 2010, but waited until October 2010 to see his general physician, Dr. Bernadette Reyes, about his hernia. (DE 96-4 at 36, 38-40.) Before seeing Dr. Reyes, McKinney did "[n]othing" to treat his hernia. (*Id.* at 37.) After he saw Dr. Reyes, she faxed a prescription to the University of Medicine and Dentistry of New Jersey ("UMDNJ") to schedule his hernia surgery.[2] (*Id.* at 38-40.)

On February 23, 2011, McKinney – who, at that time, had still not had hernia surgery – was arrested for a parole violation and taken to BCJ. He was thereafter detained at BCJ for a period of "sixty days or so" before he "went back to [SWSP]." (*Id.* at 39-41; *accord* McKinney's Feb. 28, 2011 Grievance Form, DE 99 at PageID: 769.) In other words, McKinney first arrived at BCJ roughly six months after being released from SWSP on parole, and nearly seven months after Dr. Shah first recommended surgical treatment for his hernia.

On February 28, 2011, Mr. McKinney submitted a grievance to Warden Bigott in which he stated the following:

> On 02-23-11 I was placed in custody in your facility. Prior to being locked up I was due for umbilical hernia surgery. It was ordered by Dr. Bernadette Reyes in Passaic NJ. I have a meniscus tear in my left knee. Disc issues in my neck. And back pain from bulge L4-L5. I'm having severe pain in the umbilical area. I need surgery. I'm having severe pain in my knee and also need surgery. Severe pain in my back, neck, maybe P.T. or surgery will help.[3] Severe Constipation. I need

---

[2]    This portion of the factual recitation relies solely on McKinney's statements. McKinney has not submitted any documents that substantiate his claims that he visited Dr. Reyes, that she faxed a prescription to UMDNJ, or that surgery to treat McKinney's hernia was in fact scheduled.

[3]    Nothing in the record demonstrates that any medical professional recommended that McKinney undergo surgery to address his torn left meniscus, bulging discs, or any of his other complaints of neck and back pain; McKinney's claim that surgery would be required for these ailments appears to be a self-

surgery very bad on my hernia and knee. And PT [and/or] surgery on my back
and neck.

(DE 99 at PageID: 769.)

On March 10, 2011, McKinney submitted a second grievance to Warden Bigott about
"being denied [umbilical hernia] surgery by Doctor Hemsley." (DE 99 at PageID: 767.)
McKinney further stated that he was "having severe neck, back, and left knee pain [for which he
needed] surgery also." (*Id.*) The two foregoing grievances are the only documents in the record
related to McKinney's roughly sixty-day stint at BCJ beginning on February 23, 2011.[4]

Approximately one-year later, on February 22, 2012, McKinney – who still had not had
hernia surgery – returned to BCJ. (*See* SWSP's Feb. 15, 2012 Patient Information Report, DE
97-4 at PageID: 693; BCJ's Feb. 22, 2012 Intake Report, *id.* at PageID: 694-95.) There, BCJ
medical personnel evaluated McKinney. (*See* DE 97-4 at PageID: 694-95.) BCJ's intake report
notes that McKinney then had a left meniscus tear and an umbilical hernia, and also indicates
that he had herniated discs in his neck and back. (*Id.*) That report also expressly notes, however,
that McKinney had no mobility issues and that none of McKinney's medical ailments were
emergent in nature. (*Id.*) BCJ's February 22nd report is consistent with the list of McKinney's
medical ailments detailed in SWSP's February 15, 2012 report. (*See* DE 97-4 at PageID: 693

---

diagnosis. The objective record evidence undisputedly shows (i) that McKinney's hernia is the only
medical issue for which any surgical procedure was prescribed by any medical professional; and (ii) that
McKinney's hernia surgery is the only surgical procedure that has ever been performed on him.

[4]      As I have ruled in prior opinions in this matter, the applicable statute of limitations for Mr.
McKinney's § 1983 claim of denial of medical care is two years. (*See*, e.g., June 4, 2014 Op., DE 1 at 30
(citing *Vickers v. Childs*, 530 F. App'x 104, 105 (3d Cir. 2013) (per curium) (citing N.J. Stat. Ann. §
2A:14-2(a)).) As noted *infra*, McKinney initiated this action on March 19, 2013. Thus, any portion of this
claim that accrued prior to March 19, 2011, is barred by the statute of limitations. Insofar as McKinney
intends to rely on his February 28, 2011 and March 10, 2011 grievances to show that his § 1983 claim
accrued prior to March 19, 2011, that portion of his claim is time-barred.

4

(noting that McKinney's medical problems as of that date included back pain, an umbilical hernia, neck pain, and a left meniscus injury).)

On March 1, 2012, Dr. Hemsley prescribed Colace and Metamucil. (*See* Mar. 1, 2012 BCJ's Patient Notes/Physician Orders, DE 97-4 at PageID: 696.)

On March 6, 2012, Dr. Hemsley personally examined McKinney, as evidenced by his signature at the bottom of his March 6th physical examination report. (*See* DE 99 at PageID: 837.) Hemsley's March 6th report notes that McKinney's umbilical hernia was "reducible." (*Id.*) Moreover, nothing in that report suggests that any of McKinney's ailments – including his umbilical hernia – then required surgery or were otherwise emergent in nature.

On April 13, 2012, McKinney sent a handwritten note to BCJ's medical department requesting that they "continue [his] fiber supplement [*i.e.*, Metamucil] for twice a day and discontinue the Colace at night." (DE 97-4 at PageID: 697.) BCJ's April 16, 2012 medical notes indicate that Dr. Hemsley honored that request. (DE 97-4 at PageID: 696.)

On July 24, 2012, McKinney complained to BCJ medical staff of "being in pain from several past injuries" and requested Motrin (ibuprofen, a pain reliever and non-steroidal anti-inflammatory drug) to treat that pain. (*See* BCJ's July 24, 2012 Nursing Notes, DE 97-4 at PageID: 701.) At that time, McKinney was advised that he could purchase Motrin from BCJ's commissary. (*Id.*)

On September 12, 2012, BCJ nursing staff noted that McKinney complained of "not being able to defecate," stated that he needed Metamucil, and requested a "follow-up consultation." (DE 97-4 at PageID: 704.)

On September 18, 2012, McKinney submitted a formal grievance to Captain Pawson in which he complained that he had been "denied medical treatment for a month or so," was being

5

"denied medicine for constipation and pain," was "in severe pain in the umbilical area due to a hernia," that his "knee [has] given out on [him]," that he had "severe pain in [his] back and neck," and that he needed surgery. (DE 99 at PageID: 759.) It appears that McKinney made similar complaints and requests to BCJ medical personnel on that date. (*See* BCJ's Sept. 18, 2012 Nursing Notes, DE 97-4 at PageID: 703.)

On September 19, 2012, McKinney submitted a separate letter to Pawson reiterating his September 18th grievances. (DE 99 at PageID: 770-71.) McKinney's September 19th letter expressly notes that he "[did not] mind buying Motrin [from the commissary] but the ones from the canteen [were] not strong enough"; instead, he wrote, he needed "800 [milligrams] of Motrin to take [his] pain away." (DE 99 at PageID: 770.) McKinney's September 19th letter tends to confirm that his pain was controlled with Motrin, and that he could obtain it without permission or a prescription from BCJ medical personnel.

On September 25, 2012, McKinney met with Dr. Hemsley. (*See* BCJ's Sept. 26, 2013 Physician Progress Record, DE 97-4 at PageID: 705.) At that time, Hemsley observed that McKinney did not appear to have "acute or obvious distress"; that "[he was] seated up-right on the exam table"; and that he had a "nontoxic appearance." (*Id.*) Hemsley also explained to McKinney that he could simply take additional 200 milligram Motrin pills purchased from the commissary to obtain a total 800-milligram dose. McKinney agreed. (*Id.*)[5] With respect to McKinney's umbilical hernia, Hemsley observed saw no signs of obstruction and, yet again, expressly noted that it remained nonincarcerated. (*Id.*) Hemsley prescribed Naprosyn to address

---

[5]     I note as background that all of the adult over-the-counter versions of Motrin seem to contain 200mg of ibuprofen in each tablet, gel, or caplet. www.motrin.com/products.

McKinney's complaint that "his umbilical hernia [was] causing him some discomfort" and also prescribed more Metamucil for him. (*Id.*)

On October 3, 2012, McKinney submitted a formal grievance to Warden Bigott indicating that he "saw Dr. Hemsley about a week ago" and that Hemsley was "still denying [him] hernia surgery." (DE 99 at PageID: 760.)

On November 3, 2012, McKinney filed another formal grievance to the attention of Bigott and Pawson that reads, in its entirety, as follows:

> What is it going to take you dumb ass people to answer my grievances. I need hernia surgery. I keep getting denied. I have a bad hernia [that is] causing me pain and severe constipation. My left knee has a [tear]. My back has a bulge and neck disc issues. I'm calling my family and lawyer. I'm sick of your dumb asses. I need surgery very bad jerks.

(DE 99 at PageID: 768.)

Dr. Hemsley again saw McKinney on January 15, 2013, at which time McKinney again requested that his umbilical hernia be repaired. (*See* BCJ's Jan. 15, 2013 Physician Progress Record, DE 97-4 at PageID: 709.) During that visit, Hemsley observed that McKinney had no constipation, a nontoxic appearance, and that the condition of McKinney's umbilical hernia remained "unincarcerated" and otherwise "unchanged." (*Id.*) Hemsley determined "that at this point a repair of [McKinney's] hernia [was] elective." (*Id.*)

On January 19, 2013, McKinney submitted a formal grievance to the attention of, among others, Warden Bigott and Captain Pawson. (DE 99 at PageID: 764.) McKinney complained that he "saw Dr. Hemsley a few days ago and he's still denying me surgery." (*Id.*) McKinney reiterated that was unable to "take the pain and constipation any longer from [his] hernia" and that he continued to experience "left knee pain from a meniscus [tear]" and "back and neck pain also." (*Id.*)

7

It appears that Dr. Hemsley examined McKinney again on February 8, 2013, as evidenced by his signature at the bottom of BCJ's contemporaneous physical examination report. (DE 99 at PageID: 834.) Although that report is largely illegible, it does clearly state that during McKinney's February 8th examination, he again complained of constipation, and again stated that he wanted to have his umbilical hernia repaired. (*Id.*)

On March 30, 2013, McKinney complained to BCJ medical staff about hernia-related pain. (*See* DE 97-4 at PageID: 712.) BCJ's medical notes memorializing the same indicate that McKinney's "hernia [remained] reducible" and that McKinney did not "appear [to be] in acute distress." (*Id.*) In a handwritten letter addressed to Dr. Hemsley dated April 1, 2013, McKinney explained that "if [he] didn't have the hernia [he] could work out," and that he needed Hemsley "to advocate for [him]" so that McKinney could "get back to moving around." (DE 99 at PageID: 778-79.)

On April 8, 2013, McKinney submitted a formal grievance to Dr. Hemsley indicating that he was in "serious pain" from his hernia, that he needed hernia surgery, and that his "knee, back, and neck [were also] bothering [him]." (DE 99 at PageID: 765.) On that same day, McKinney also submitted a "follow-up sick call slip" to BCJ medical staff regarding these "multiple symptoms." (*See* BCJ's Apr. 8, 2013 Nursing Notes, DE 97-4 at PageID: 714.)

On April 12, 2013, McKinney's attorney, Jeffrey B. Steinfeld, sent a letter to the Bergen County Sheriff's Department asking Undersheriff Steven Librie to "immediately speak with the Medical Unit at [BCJ], most specifically Dr. Hemsley, and arrange for [hernia] surgery for Mr. McKinney to abate his deteriorating medical condition."[6] (DE 99 at PageID: 755-56.) In that

---

[6]     Mr. Steinfeld's two-page letter does not contain any medical evidence. (*See* DE 99 at PageID: 755-56.)

8

letter, Mr. Steinfeld states that "Dr. Hemsley advised Mr. McKinney that surgery will not be scheduled for him because [Bergen County] will not pay for the same." (*Id.*) On April 20, 2013, McKinney submitted a formal grievance to Warden Bigott again emphasizing his "need [for] hernia and knee surgery." (DE 99 at PageID: 766.)

In late May 2013, McKinney was admitted to the BCJ infirmary after complaining about numbness, weakness, and tingling in his arms. (DE 99 at PageID: 762.) BCJ's nursing notes make clear that McKinney received extensive medical attention during that time, notwithstanding that he acted in a "disruptive" manner. (*See* DE 97-4 at PageID: 718-29.) Nothing in the record suggests that this infirmary visit related to the prior complaints about the hernia or other knee, back, and neck ailments.

McKinney does not appear to have filed any additional grievances with BCJ about his medical care after June 3, 2013.[7] BCJ's medical notes during that period, however, do indicate that McKinney met with BCJ medical staff on June 5th and 14th, 2013 (*see* DE 97-4 at PageID: 722), and that he was prescribed various medications on June 24th and July 5th, 6th, 11th, 25th, and 31st, 2013 (*see* DE 97-4 at PageID: 723-726.) McKinney remained at BCJ until August 1, 2013, at which time he was transferred to NJSP. (*See* McKinney's Feb. 27, 2018 Dep. Tr. 31, DE 96-4.)

On October 1, 2013 – two months after McKinney arrived at NJSP – an abdominal sonogram appeared to indicate that his hernia was growing. At that point, he was diagnosed with

---

[7]    On June 3, 2013, McKinney submitted a formal grievance to Warden Bigott in he claimed that while he was admitted to BCJ's infirmary in late May, Dr. Hemsley "threatened [him] with being put in the hole if [he kept] complaining." Mr. McKinney then stated that "[he] need[ed] surgery but [was now] scared to complain." (DE 99 at PageID: 762.) Hemsley, for his part, denies that this incident occurred. (*See* Hemsley's Mar. 29, 2018 Interrog. Resp. No. 26, DE 96-5 at PageID: 630.) I have already ruled that the only viable, remaining § 1983 claim against Dr. Hemsley relates to his purportedly deliberate indifference to McKinney's serious medical needs. I will consider this purported occurrence in the context of that claim.

a "[n]onreducible 3.5 x 1.5 cm protrusion of the umbilicus, pain" and an "[i]nfrahumbilical hernia measuring 7.5 x 4.9 x 6.2 cm." (NJSP's Oct. 7, 2013 Diagnostic Report, DE 99 at PageID: 782.) On June 17, 2014 – over ten months after McKinney arrived at NJSP – Dr. Shah evaluated McKinney's "longstanding" hernia. (*See* NJSP's June 19, 2014 Consultation Report, DE 99 at PageID: 781.) Dr. Shah then noted that McKinney was not then experiencing any pain, nausea, or vomiting, but that his hernia was getting larger. (*Id.*) Dr. Shah – as he did in 2010 – indicated that surgery would be scheduled in two to three weeks. (*Id.*)

On July 17, 2014 – some eleven months after McKinney left BCJ – Dr. Shah performed surgery to repair the hernia. (*See* St. Francis Medical Center's July 18, 2014 Operative Report, DE 99 at PageID: 774.) On August 5, 2014, Dr. Shah reported that McKinney was "healing well" and was "quite satisfied," and accordingly discharged him from NJSP's surgical clinic. (*See* NJSP's Aug. 11, 2014 Consultation Report, DE 99 at PageID: 780.)

During his deposition, McKinney was asked a number of questions about his quality of life since his hernia surgery. McKinney complained about ongoing constipation and diarrhea. (DE 96-4 at 55.) He testified that a nurse practitioner named Sumer Caid told him that the fact that "it took so long for [McKinney] to get [the surgery] . . . could be part of [those] problems." (*Id.* at 58.) He also conceded, however, that he has no written report or other objective evidence demonstrating that his condition worsened because hernia surgery was not performed until July 17, 2014. (*Id.* at 58-59.) Indeed, McKinney expressly noted that he has no written report "[f]rom a physician or anyone with any expertise that says that [his] condition was worse based on [that delay]." (*Id.*) McKinney also testified that he continues to abstain from many of the physical activities that he claimed he was precluded from doing but for his hernia, *e.g.*, playing basketball and doing pushups. (*Id.* at 60-63.)

### b. Procedural History

With those undisputed facts in mind, I now turn to the procedural history of this matter. McKinney initiated this action on March 19, 2013[8] via the filing of an omnibus complaint. In it, he asserted a truly bewildering variety of claims against virtually everyone involved in his arrest and prosecution, as well as numerous parties at the institutions where he had formerly been incarcerated. (*See* DE 4.) Upon screening McKinney's complaint, I observed that it "contain[ed] many unrelated allegations against disparate defendants that are not properly joined in a single complaint under Federal Rules of Civil Procedure 18 and 20." (DE 1 at 25.) I accordingly severed all of the claims in McKinney's complaint that arose from his imprisonment at BCJ and directed the Clerk to open the present matter as a separate, stand-alone, civil action. (*See* June 4, 2014 Order, DE 3.)

Thus the only claims in the complaint that are part of this specific civil action are the ones alleged to have occurred during McKinney's time at BCJ. (*See* Complaint, DE 4; Opinion severing claims, DE 1.) In my June 4, 2014 screening opinion (DE 6), I dismissed a substantial number of claims against many of the BCJ-related defendants, including one against Aramark Foods for serving dishes with mayonnaise, prison authorities' failure to respond to grievances, opening of mail, and threatened retaliation. I did, however, allow McKinney's § 1983 denial of medical care claim and disregard of grievances claims to proceed against named defendants Hemsley, Pawson, Bigott, and two other BCJ-affiliated defendants, Lieutenant Pickel and

---

[8]     March 19, 2013 is the date on which Mr. McKinney executed his complaint. (*See* DE 4 at PageID: 45.) Under the federal prisoner mailbox rule, "a document is deemed filed on the date it is given to prison officials for mailing." *Pabon v. Mahanoy*, 654 F.3d 385, 391 n. 8 (3d Cir. 2011). Affording McKinney all favorable inferences, I find that March 19, 2013 represents the date on which he initiated this action.

Captain Davies.[9] (*See* DE 1 at 24; *see also* Apr. 29, 2015 Op., DE 6 at 5 ("Mr. McKinney's claims that Bigott, Davies, Pickel, Hemsley and Pawson failed to respond to his medical complaints or to furnish medical treatment were permitted to proceed.").)

On April 29, 2015, I denied McKinney's motion to amend his complaint to assert new claims against non-party Corizon Medical and denied his request that I reconsider my June 4, 2014 rulings. (*See* Apr. 29, 2015 Op. and Order, DE 6 & 7.) On October 9, 2015, I denied McKinney's second application to amend his complaint. (*See* Oct. 9, 2015 Op. and Order, DE 22 & 23.) As I then explained, "the allegations of [McKinney's] complaint in this action relate to the medical care Mr. McKinney was receiving (or not receiving) while incarcerated at [BCJ] for his herniated discs in his neck, his left knee meniscus tear, a lower back bulge and a hernia. Mr.

---

[9] I note that in my June 4, 2014 screening opinion, I also found that McKinney stated a plausible § 1983 opening of legal mail claim against a still-unidentified John Doe defendant. (*See* DE 1 at 18-19). I specifically noted the following about that claim:

> Mr. McKinney also claims that an unnamed John Doe officer at [BCJ] opened his legal mail outside of his presence on November 3, 2012. "[P]rison officials impinge upon the First Amendment rights of prisoners when they open prisoners' legal mail outside the presence of the addressee prisoner." *Taylor v. Oney*, 196 F App'x 126, 128 (3d Cir. 2006)
> . . .
>
> The allegations of [McKinney's] complaint suggest that this incident, if it occurred, may have been a one-time, negligent slip-up. Nevertheless, giving this *pro se* claim a liberal reading, *if Mr. McKinney elects to go forward with this claim*, I will put defendants to the burden of answering or otherwise responding to it.

(*Id.* (emphasis added.) McKinney has not further pursued this claim since. Indeed, McKinney has not provided additional information in support of this claim at any point in this now years' long litigation, including in the course of his two prior unsuccessful efforts to amend his complaint. Moreover, McKinney's complaint has never been amended to identify this still-unnamed defendant, and no such defendant has ever been served. I also, however, have never formally dismissed this claim. I will therefore now formally dismiss it without prejudice. *Stokes v. Riskus*, No. CA 14-60, 2015 WL 1326200, at *5 (W.D. Pa. Mar. 24, 2015) ("the unidentified Defendant Sergeant John Doe has never been served in this case, and no attorney has entered an appearance on his behalf. As a result, said Defendant will be dismissed from this case pursuant to Rule 4(m) of the Federal Rules of Civil Procedure") *Aguiar v. Recktenwald*, No. CV 3:13-2616, 2016 WL 145259, at *1 (M.D. Pa. Jan. 11, 2016), *aff'd*, 649 F. App'x 293 (3d Cir. 2016) ("Rule 4(m) mandates the dismissal of the claims against the John Doe Defendant because plaintiff has not timely served a summons on the John Doe Defendant.") (citing *Beckerman v. Weber*, 317 F. App'x 125, 128 (3d Cir. 2008); *Baumgardner v. Ebbert*, 535 F. App'x 72, 77 n.7 (3d Cir. 2013)).

12

McKinney's proposed new allegations are not closely related to the old ones, and they name new defendants." (Oct. 9, 2015 Op., DE 22 at 5-6.)

On September 28, 2017, I granted in part and denied in part the motion to dismiss filed by Bigott, Davies, Pawson, and Pickel. (Sept. 28, 2017 Op. and Order, DEs 70 and 71.) All claims against Davies and Pickel were dismissed. (DE 70 at 7, 11). I determined that Mr. McKinney's only claim against Warden Bigott that could proceed further was his claim "that [Bigott] was deliberately indifferent to the withholding of medical care." (*Id.* at 10.) I likewise permitted McKinney's claims against Pawson to proceed, but only with respect to McKinney's allegation that Pawson "ignored medical needs." (*Id.* at 11.) In that regard, I specifically noted that "[McKinney's] complaint alleges that Captain Pawson [was in charge of the medical unit at BCJ and that Pawson] permitted the medical department to ignore [McKinney's] medical needs and did not respond to [McKinney's] letter grievances." (*Id.*) With respect to Hemsley (who did not move for dismissal), I noted that McKinney's "complaint alleges that two doctors previously told McKinney that he needed hernia surgery and that one had actually prescribed surgery. He claims that Dr. Hemsley refused to send him for surgery. Thus, Mr. McKinney has potentially alleged a constitutional violation by Hemsley." (*Id.* at 9.)

In short, and as the foregoing demonstrates, the only claim that remains pending is McKinney's § 1983 claim of deliberate indifference to medical needs, asserted against Hemsley, Pawson, and Bigott. On June 25, 2018, those three defendants filed their respective Rule 56 motions for summary judgment. (DE 96, 97.) Mr. McKinney filed an opposition to both motions on July 26, 2018. (DE 99.) No defendant submitted a reply.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment. *Id.*

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A party asserting that a fact [is not] genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents . . . , affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)). "If

reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F. 3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In that respect, the Court's role in deciding a motion for summary judgment is simply "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## IV.   ANALYSIS

### a.   Section 1983 Claim for Denial of Medical Care

As noted above, McKinney asserts that Hemsley, Bigott, and Pawson each acted with deliberate indifference to his serious medical needs when McKinney was incarcerated at BCJ. This claim is actionable under federal law pursuant to 42 U.S.C. § 1983. Section 1983 provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Thus, to obtain relief under this statute, a plaintiff must establish: (i) that one of his rights secured by the Constitution or laws of the United States was violated; and (ii) that this violation was caused or committed by a person acting under color of state law. *See West v. Atkins*, 487

15

U.S. 42, 48 (1988); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (noting that Section 1983 does not provide substantive rights; rather, it provides a vehicle for vindicating violations of other federal rights).

In the seminal decision of *Estelle v. Gamble*, 429 U.S. 97 (1976), the United States Supreme Court made clear that: (i) "the government [is obligated] to provide medical care for those whom it is punishing by incarceration[;]" (ii) "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment[;]" (iii) prison officials violate the Eighth Amendment when they act deliberately indifferent to a prisoner's serious medical needs by "intentionally denying or delaying access to medical care or interfering with the treatment once prescribed[;]" and (iv) "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983."[10] *Estelle*, 429 U.S. at 103-05.

In accordance with *Estelle* and its progeny, Mr. McKinney's Section 1983 deliberate indifference claim will survive summary judgment only if he "make[s] (1) a subjective showing that 'the defendants were deliberately indifferent to [his] medical needs' and (2) an objective showing that 'those needs were serious.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017). In other words, to withstand summary judgment, "the evidence[, when viewed in the light most favorable to McKinney,] must demonstrate acts or omissions by prison officials that indicate deliberate indifference to a serious medical need." *Guiddy v. Terhune*, 90 F. App'x 592, 597 (3d Cir. 2004) (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003); *see also Pearson*, 850 F.3d at 536 (holding that "the party moving for summary judgment

---

[10]     Non-convicted pretrial detainees are afforded substantially similar protections under the Due Process Clause of the Fourteenth Amendment. *See Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005) ("pretrial detainees' [are protected] from 'punishment' under the Fourteenth Amendment, and convicted inmates [are protected] from punishment that is 'cruel and unusual' under the Eighth Amendment.").

[on a § 1983 deliberate indifference to medical needs claim] may satisfy Rule 56" by demonstrating that "the nonmoving party's evidence is insufficient to establish an essential element of [that] claim") (citing *Celotex*, 477 U.S. at 331).

The case law contains several caveats, or limitations on this cause of action:

First, "prisoners do not have a constitutional right to limitless medical care." *Brown v. Beard*, 445 F. App'x 453, 456 (3d Cir. 2011). Instead, "the state is obligated to provide [prisoners with] basic health care." *Reynolds v. Wagner*, 128 F.3d 166, 173 (3d Cir. 1997); *see also Brown*, 445 F. App'x at 455 ("[t]he Eighth Amendment mandates that prisoners receive access to basic medical treatment.") (citing *Estelle*, 429 U.S. at 104).

Second, where, as here, "a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 227-28 (3d Cir. 2017); *accord United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979) ("[w]here a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").

Third, "when medical care is provided, [courts] presume that the treatment of a prisoner is proper *absent evidence* that it violates professional standards of care." *Pearson*, 850 F.3d at 535 (emphasis added); *accord Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights"); *Monmouth Cty. Corr. Inst. v. · Lanzaro*, 834 F.2d 326, 346 (3d. Cir. 1987) ("mere disagreement as to the proper medical treatment" does not "support a claim of an eighth amendment violation"); *Inmates of Allegheny*

*Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) ("the propriety or adequacy of a particular course of treatment . . . remains a question of sound professional judgment."). Thus, neither a prisoner's personal, subjective dissatisfaction with the care he has been provided, nor his disagreement with the professional judgment of trained medical staff, in and of itself, is sufficient to establish deliberate indifference. *See Hairston v. Director Bureau of Prisons*, 563 F. App'x. 893, 895 (3d Cir. 2014); *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990); *Andrews v. Camden Cty.*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000).

Fourth, however, there are nevertheless "circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." *Palakovic*, 854 F.3d at 228. For example, prison officials "cannot deny reasonable requests for medical treatment . . . [when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury." *Id.* (citations and internal quotations omitted). Likewise, "knowledge of the need for medical care may not be accompanied by the intentional refusal to provide that care." *Id.* (citations and alterations in original omitted).

### b. Application

#### 1. Whether McKinney Has Established a Serious Medical Need

As an initial matter, I will address whether the record evidence demonstrates that any of Mr. McKinney's medical ailments serious enough to satisfy *Estelle's* objective prong. Serious medical needs under *Estelle* include "one[s] . . . diagnosed by a physician as requiring treatment or one[s] that [are] so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Mattern v. City of Sea Isle*, 657 F. App'x 134, 139 (3d Cir. 2017) (quoting *Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).

### (i) Umbilical hernia

I find, contrary to Dr. Hemsley's assertion (*see* DE 97-1 at 11), that McKinney's umbilical hernia is sufficiently serious under this standard. It is undisputed that a qualified physician, Dr. Rajiv Shah, prescribed surgery to treat McKinney's hernia in 2010. (*See* DE 99 at PageID: 841). That is enough, particularly under a Rule 56 standard. *See Guiddy*, 90 F. App'x at 597 ("Guiddy's hernia condition was sufficiently serious because it was diagnosed by a physician as requiring treatment."); *Horton v. Ward*, 123 F. App'x 368, 372 (10th Cir. 2005) ("we have no trouble concluding that plaintiff's umbilical hernia was a serious medical condition."); *accord Greenland v. United States*, 661 F. App'x. 210, 214 (3d Cir. 2016) ("because a doctor diagnosed [plaintiff] with a hernia requiring surgery, he described a serious medical need.").

### (ii) Knee, neck, back and other complaints

I do, however, agree with Dr. Hemsley that McKinney has not adduced evidence that any of his medical complaints related to his knee, neck, and back are "serious" for purposes of *Estelle*. (DE 97-1 at 12.) The only surgical procedure that any physician has ever recommended for McKinney was for his umbilical hernia, and the hernia surgery is the only surgical procedure he has undergone. There is no corresponding medical evidence that McKinney's other complaints were "serious" or that his demands for surgery had a legitimate medical basis.

On February 22, 2012, BCJ medical personnel noted a left meniscus tear and herniated discs in McKinney's neck and back. (DE 97-4 at PageID: 695.) McKinney made repeated written demands to BCJ staff for surgery to address his subjective complaints of pain associated with those ailments. (*See, e.g.*, DE 99 at PageID: 759, 768.) That said, the record is devoid of any objective evidence demonstrating that any medical professional ever concluded that surgery – or

any other specific treatment – was required for McKinney's torn meniscus and herniated discs. The medical opinion that surgery was required is attributed to no one but McKinney himself. There are no medical reports or other objective evidence in the record that recommend treatment – surgical or otherwise – for these conditions. McKinney's repeated demands for neck, back, and knee surgery are no substitute for medical evidence.

Dr. Hemsley, for his part, avers that during McKinney's time at BCJ, these pre-existing conditions "were treated with NSAID pain relievers, Motrin and Tylenol," and that they never "presented a serious, urgent, or emergent medical need or that surgery or invasive treatment was otherwise medically necessary." (*See* Hemsley Cert., DE 98 at ¶ 13.) Hemsley's certification is entirely consistent with that conservative course of treatment and the objective evidence of record. For example, BCJ's February 22, 2012 Intake Report expressly notes that neither McKinney's herniated discs nor his torn meniscus required specific or immediate medical care. (DE 97-4 at PageID: 694-95.) Many of BCJ's subsequent medical notes likewise indicate that these ailments did not present as sufficiently serious to require treatment. When Hemsley met with McKinney on September 25, 2012, he explicitly noted that McKinney did not then appear to be in acute or obvious distress and sat upright on the exam table. (DE 97-4 at PageID: 705.) Similarly, BCJ's March 30, 2013 patient notes indicate that McKinney did not then appear in acute distress. (*Id.* at PageID: 712.)

In summary, there is a complete lack of objective medical evidence that surgery was required to address McKinney's torn meniscus and herniated discs. There is a similar dearth of evidence demonstrating that any medical professional considered any of these conditions to be of an urgent or emergent nature. On this record, I must conclude and a matter of law that McKinney

has failed to raise a genuine issue of fact that his medical complaints related to his knee, neck, and back were sufficiently serious to satisfy the objective prong of *Estelle*.

In arriving at that conclusion, I find the Third Circuit's 2017 decision in *Pearson, supra*, decision, which affirmed summary judgment for defendant on a § 1983 plaintiff's claims of deliberate indifference to serious medical needs, to be particularly persuasive. In *Pearson*, the Third Circuit held "that medical expert testimony may be necessary to establish deliberate indifference in an adequacy of care claim where, as laymen, the jury would not be in a position to determine that the particular treatment or diagnosis fell below a professional standard of care." *Pearson*, 850 F.3d at 536. More pertinently, *Pearson* outlined "when expert testimony is necessary to create a genuine dispute that the prisoner's medical needs are serious." *Id.* at 535. In so doing, the *Pearson* Court cited favorably to two prior decisions:

> In *Boring v. Kozakiewicz*, 833 F.2d 468 (3d Cir. 1987), we held that a district court may properly require expert medical opinions when, "[a]s laymen, the jury would not be in a position to decide whether any of the conditions described by plaintiffs could be classified as 'serious.'" *Id.* at 473. In *Brighthwell v. Lehman*, 637 F.3d 187 (3d Cir. 2011), we reiterated our holding in *Boring*, clarifying that expert testimony "is not necessarily required to establish the existence of a serious medical need" and that "[o]ther forms of extrinsic proof . . . may suffice in some cases." *Id.* at 194 n.8.

*Pearson*, 850 F.3d at 535.

In the first of the two above-cited cases, *Boring v. Kozakiewicz*, the Third Circuit – applying the standard set out in *Estelle* – "considered whether former pretrial detainees seeking damages in constitutional claims for lack of medical care must produce expert testimony to establish that their ailments were serious." *Boring*, 833 F.2d at 469, 472. One of those detainees, Geidel, suffered from a non-acute, pre-existing, knee injury that "qualified for elective surgery which safely could be deferred[.]" *Id.* at 473. Another detainee, Boring, suffered from an ulnar nerve condition which a physician concluded could be treated with "elective" surgery. *Id.* The

21

Third Circuit found that an expert's medical opinion would be required to substantiate that Geidel and Boring's conditions were objectively serious, and without such evidence, those plaintiffs could not, as a matter of law, establish entitlement to § 1983 relief. *Id.* at 473-74. The *Boring* Court also recognized, however, that "[i]n some situations in which the seriousness of injury or illness would be apparent to a lay person, expert testimony would not be required, *e.g.*, a gunshot wound."

In the second of the above-cited cases, *Brightwell v. Lehman,* the Third Circuit considered, among other things, whether "disputed issues of material fact precluded summary judgment" on § 1983 plaintiff Brightwell's claim that various prison officials were deliberately indifferent to his serious medical needs. *Brightwell,* 637 F.3d at 191. Brightwell's "allegedly unattended-to [medical] conditions [included, among others,] blurred vision[] and severe 'imploding-type' migraines caused by 'a capsule' mistakenly left in his right eye during a botched cataract surgery[.]" *Id.* at 189. Brightwell claimed that those "conditions required . . . remedial eye surgery." *Id.* The Third Circuit affirmed the district court's entry of summary judgment on this claim. It noted that the record was devoid of expert testimony or any "[o]ther forms of extrinsic proof—*e.g.*, medical records, photographs, *etc.*, . . . required to establish the existence of a serious medical need." *Id.* at 194 n.8. Indeed, "aside from Brightwell's own vague assertions and self-diagnoses, all of the record evidence—including [Department of Corrections] records and supporting affidavits from prison officials—indicate that he received appropriate . . . regular medical screenings, including one by an optometrist who recommended bifocal lenses, which Brightwell refused to wear. Brightwell's Eighth Amendment claims [were] thus based entirely on 'speculation, conclusory and ambiguous allegations, and vague inferences.'" *Id.* at

194 (citing *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252, 254 (3d Cir.1999) (alterations in original omitted).

In this case, McKinney has proffered the opinions of experts, *i.e.*, his treating physicians, but they are adverse to his claim. These opinions do not anywhere so much as suggest that any ailment (other than the hernia) was ever considered by a medical professional to require surgery or other formally prescribed treatment. Like the plaintiff in *Brightwell*, McKinney has not presented any reports, notes, or other objective medical evidence recommending surgery or other formal treatment for the torn meniscus and bulging discs. Like the plaintiffs in *Boring*, McKinney has not presented any evidence to substantiate his claim that surgery for these conditions was medically necessary. On this record, the only conclusion a fact finder could reach is that McKinney's repeated demands for knee, neck, and back surgery and physical therapy were based entirely on his own medical opinion. *See Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) (holding that a prisoner's "self-diagnosis" was insufficient to establish the existence of objectively serious medical need).

Nor do McKinney's torn meniscus or herniated discs fit within the narrow loophole for conditions so obviously serious (such as a gunshot wound) that lay opinion will suffice. *See Johnson v. Wright*, 477 F. Supp. 2d 572, 575 (W.D.N.Y. 2007), *aff'd*, 324 F. App'x 144 (2d Cir. 2009) (holding that plaintiff's torn meniscus was "not a 'serious medical need' for Eighth Amendment purposes") (collecting cases); *Gray v. McCann*, No. 3:08CV00154 JMM/JTR, 2009 WL 2762718, at *3 (E.D. Ark. Aug. 28, 2009) (awarding summary judgment in favor of medical doctor where record showed that physician "determined, on at least two occasions, that Plaintiff was not in urgent need of medical treatment for his complaints of neck pain [that he attributed to

a bulging disc in his neck]" and "Plaintiff [failed to present] any medical evidence to refute that conclusion.").

As a matter of law, then, McKinney has not raised a factual issue that any of his medical needs (other than his hernia) were "serious" for purposes of a deliberate-indifference claim under § 1983.

### 2. Dr. Hemsley Was Not Deliberately Indifferent to McKinney's Medical Needs

I move to the issue of Dr. Hemsley acted with deliberate indifference to McKinney's serious medical needs. *See Pearson*, 850 F.3d at 534. For the reasons stated above, the only "serious" medical condition was the hernia, so I focus on that.

"[T]he mere receipt of inadequate medical care does not itself amount to deliberate indifference—the defendant must also act with the requisite state of mind when providing that inadequate care." *Id.* at 535; *accord Guiddy*, 90 F. App'x at 597-98. ("Finding a prison official liable for violating a prisoner's Eighth Amendment rights requires proof that the official knew of and disregarded an excessive risk to inmate health or safety. He must be both aware of facts from which the inference could be drawn that a substantial risk of harm exists and must draw that inference.") (citing *Natale*, 318 F.3d at 582). In that regard, "deliberate indifference is a subjective state of mind that can, like any other form of scienter, be proven through circumstantial evidence and witness testimony." *Pearson*, 850 F.3d at 534.

Dr. Hemsley argues that "the record evidence is clear that [he] did not act with deliberate indifference in his medical care and evaluation of McKinney." (DE 97-1 at 12.) For the reasons discussed *supra* at Section IV.c.1, and for the additional reasons detailed below, I must agree that the evidence does not raise a genuine, material issue of fact as to deliberate indifference.

First, the evidence of record is uncontroverted that "McKinney was provided with regular treatment for various medical issues and was consistently prescribed Metamucil and pain relievers to address his complaints of constipation and discomfort." (DE 97-1 at 12.) I have already outlined the objective record evidence—chiefly, the medical record from BCJ—which supports this conclusion. (*See* Section II.a, *supra*.) That same evidence likewise demonstrates that "Dr. Hemsley evaluated McKinney's hernia on multiple occasions in 2012 and 2013, finding that the condition had not changed or worsened, but that it had remained as non-urgent, non-emergent, reducible, and non-strangulated." (DE 97-1 at 12.) [11] So I am mindful that this is not a case in which a prisoner was simply denied medical treatment—far from it. "Where a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979). Where treatment is being given, I am reluctant to transform an ordinary

---

[11]     For convenience, I summarize the medication prescribed for McKinney during his time at BCJ for his hernia and subjective complaints of pain: Dr. Hemsley ordered Naprosyn for McKinney on September 26, 2012 and December 28, 2012. (DE 97-4 at PageID: 702, 705, 708.) Dr. Hemsley ordered Motrin for McKinney on January 28, 2013 and July 25, 2013 (see DE 97-4 at PageID: 708, 725), notwithstanding that McKinney could and did purchase Motrin directly from BCJ's commissary. McKinney also received a prescription for Tylenol on May 24, 2013. (DE 97-4 at PageID: 719.) Various BCJ medical personnel, including Hemsley, prescribed Metamucil for McKinney on April 16, 2012, May 14, 2012, June 14, 2012, July 9, 2012, August 6, 2012, September 26, 2012, October 31, 2012, December 30, 2012, February 23, 2013, April 1, 2013, May 2, 2013, July 6, 2013, and July 31, 2013 (DE 97-4 at PageID: 696, 698-700, 702, 706, 708, 711, 713, 717, 723, 726.)

     Likewise, I summarize McKinney's treatment at BCJ for medical complaints that were unrelated to his hernia, torn meniscus, neck, and back. For example, on December 28, 2012, BCJ medical staff treated McKinney for pain and swelling in his right big toe. (DE 99 at PageID: 707.) BCJ medical staff likewise prescribed anti-fever medication to McKinney on January 1, 2013 in response to his complaints of dry cough, rhinitis, and body aches. (*Id.* at PageID: 707.) They also ordered cold and allergy medicine for McKinney on January 28, 2013. (*Id.* at PageID: 708.) Dr. Hemsley himself prescribed anti-hypertensive medication in response to a report that McKinney's blood pressure was elevated on April 19, 2013. (*Id.* at PageID: 709; *accord id.* at PageID: 715.) And McKinney was admitted to the BCJ infirmary – and received extensive medical attention there – in May of 2013, after complaining about numbness, weakness, and tingling in his arms. (*See id.* at PageID: 718-29.)

difference of opinion about the appropriate level or nature of treatment into a claim of cruel and unusual punishment.

The objective record evidence is consistent with Dr. Hemsley's certification in support of summary judgment. (DE 98.) Hemsley has certified that "at all times that [McKinney] was under [his] care at [BCJ, McKinney's] hernia presented as non-incarcerated and reducible. . . [and] did not present a serious urgent, or emergent medical need [and, thus, that surgery] would have been elective only." (*Id.* at ¶ 12.) Moreover, in Hemsley's "medical judgment, not having a surgery to repair the hernia did not pose any significant threat to McKinney's health. Accordingly, [Hemsley] prescribed conservative treatment for McKinney that did not involve an invasive surgery." (*Id.*) He instead treated "the constipation and slight periodic discomfort that McKinney experienced as a result of the hernia . . . with Metamucil and NSAID pain relievers." (*Id.*)

Furthermore, although there was evidence of growth, nothing in the record suggests that McKinney's hernia significantly worsened in the roughly four-year period between Dr. Shah's initial surgical recommendation and the date on which he ultimately performed that surgery. Indeed, in both of his July 6, 2010 and June 19, 2014 evaluations recommending surgical treatment, Dr. Shah indicated that McKinney's hernia surgery would be scheduled some weeks later. This is consistent with Dr. Hemsley's conclusion that McKinney's hernia never rose to the level of an "urgent, or emergent medical need." (See DE 97-1 at 11.) (Indeed, McKinney himself delayed surgery after the 2010 evaluation of Dr. Shah on which he chiefly relies.) This consideration also supports entry of summary judgment. *See Jackson v. Jackson*, 456 F. App'x 813, 815 (11th Cir. 2012) ("The delay in receiving surgery was [did not support a § 1983 deliberate indifference claim] because the hernia remained treatable without surgery and posed no risk to Jackson's health. Moreover, the delay did not worsen Jackson's condition. That

Jackson felt he should have had surgery earlier than he did is insufficient to support a deliberate indifference claim."); *Guiddy*, 90 F. App'x at 598 (affirming entry of summary judgment in favor of treating physician on deliberate indifference claim where, among other things, there was no "evidence in the record indicating this treatment was inappropriate or caused additional harm."). A mere diagnostic difference is insufficient to establish "deliberate indifference." "A professional disagreement between doctors as to the best course of treatment does not establish an Eighth Amendment violation." *White v. Napoleon*, 897 F. 2d 103, 110 (3d Cir. 1990).

It is true that Dr. Shah diagnosed McKinney with an incarcerated hernia that required surgery in 2010. McKinney himself, however, put off surgery for many months. Thereafter, on multiple occasions in 2012 and 2013, Dr. Hemsley diagnosed McKinney's hernia as non-incarcerated and susceptible to conservative treatment. The record evidence is clear that Hemsley "formed a medical judgment that [McKinney's] hernia was reducible without surgery." *Brown*, 445 F. App'x at 455. That Dr. Shah's diagnosis and course of treatment differed from Dr. Hemsley's does not, in and of itself, provide a basis to conclude that Hemsley acted with constitutionally-actionable deliberate indifference to McKinney's hernia. *Pearson*, 850 F.3d at 543 ("the record is not sufficient for a reasonable jury to conclude that Dr. McGrath was deliberately indifferent to [Pearson's] medical needs. Since Dr. McGrath ordered pain medication, exercise to help with breathing, and a follow-up medical appointment upon Pearson's return to the prison, any complaint that he should have ordered additional observation is no more than a 'mere disagreement as to the proper medical treatment' that does not 'support a claim of an eighth amendment violation.'") (citing *Lanzaro*, 834 F.2d at 346); *Brown*, 445 F. App'x at 455 (prisoner plaintiff's claim that "defendants knowingly refused him necessary surgery for his hernia despite the fact that a doctor at Altoona Hospital had recommended that he

undergo an operation" failed to state a § 1983 deliberate indifference to medical needs claim where "it [was] evident . . . that defendants formed a medical judgment that Brown's hernia was reducible without surgery[,]" "prescribed him pain medication and an abdominal binder[,]" and "regularly monitored his condition."); *Johnson v. Doughty*, 433 F.3d 1001, 1015 (7th Cir. 2006) (holding prison medical personnel did not act with deliberate indifference when they opted for non-surgical treatment, *i.e.*, a hernia belt, Tylenol, Metamucil, and monitoring, in response to prisoner's reducible hernia).

The record is unrebutted that Hemsley "regularly monitored McKinney's condition" and prescribed him pain medication and Metamucil. These considerations suggest that Hemsley, "at worst treated [McKinney] negligently" and "[n]egligence or medical malpractice does not rise to the level of a constitutional violation."[12] *Brown*, 445 F. App'x at 455-56; *Pearson*, 850 F.3d at 543 (same). And indeed, the passage of years tends to confirm that there was indeed no surgery-requiring emergency.

McKinney's claim that Hemsley told him that he would not perform hernia surgery because Bergen County would not pay for it, even if true, likewise does not preclude me from entering summary judgment. *See Brown*, 445 F. App'x at 456 ("the mere assertion that defendants considered cost in treating Brown's hernia does not suffice to state a claim for deliberate indifference, as prisoners do not have a constitutional right to limitless medical care.") Indeed, "the deliberate indifference standard of *Estelle* does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society." *Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997).

---

[12]     I make this concession *arguendo* to illustrate the legal point. I do not suggest that malpractice was committed here.

Accordingly, I will enter summary judgment in favor of Dr. Hemsley on McKinney's §
1983 claim of deliberate indifference to medical needs.

### 3. Summary Judgment is Also Entered in Favor of Pawson and Bigott

The foregoing considerations demonstrate that summary judgment must also be granted
on McKinney's § 1983 deliberate indifference claims against Capt. Pawson and Warden Bigott.

Pawson and Bigott are not medical personnel and the record does not disclose that they
possess any medical training. On these facts, if Bigott and Pawson were to be liable for
deliberate indifference to medical needs, it could only be because they were aware of or
somehow abetted the deliberate indifference of Dr. Hemsley. As explained above, however, Dr.
Hemsley did not act with constitutionally-actionable deliberate indifference to McKinney's
serious medical needs. It follows that defendants Bigott and Pawson did not violate McKinney's
constitutional rights. *See McGinnis v. Hammer*, 751 F. App'x 287, 293 (3d Cir. 2018) (affirming
award of summary judgment against non-medical defendants because § 1983 plaintiff "failed to
allege a constitutional violation, let alone one that the non-medical officials had a reason to be
aware of"); *Serrano v. Folino*, 339 F. App'x 254, 258 (3d Cir. 2009) ("Absent viable claims that
the medical defendants violated his constitutional rights, Serrano cannot state a claim against the
non-medical defendants for failing to cure the medical defendants' conduct."); *accord Spruill v.
Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("absent a reason to believe (or actual knowledge) that
prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison
official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate
indifference."). Indeed, both defendants, as "[n]on-medical officials[, were] entitled to depend on
[Hemsley's] professional[] judgment." *Brown*, 445 F. App'x at 455 n.4.[13]

---

[13]    I note in addition that the failure of Bigott or Pawson to respond directly to McKinney's medical
complaints, assuming it occurred, does not preclude me from granting summary judgment in their favor.

29

Accordingly, I will enter summary judgment in favor of Bigott and Pawson on

McKinney's § 1983 claim of deliberate indifference to medical needs.

## V.    CONCLUSION

For the foregoing reasons, Hemsley's and Bigott and Pawson's motions for summary

judgment are granted. An appropriate Order will be entered.

DATED: March 20, 2019

KEVIN MCNULTY
United States District Judge

---

Non-physicians cannot "be considered deliberately indifferent simply because they failed to respond
directly to the medical complaints of a prisoner who was already being treated by the prison doctor."
*Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993)).